**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
Yana Hart (SBN 306499)
*yhart@clarksonlawfirm.com*
Mark I. Richards (SBN 321252)
*mrichards@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050

**THE FERRARO LAW FIRM, P.A.**
James L. Ferraro *(pro hac vice forthcoming)*
*jferraro@ferrarolaw.com*
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Tel: (305)375-0111

**SULTZER & LIPARI, PLLC**
Jason R. Sultzer *(pro hac vice forthcoming)*
*sultzerj@thesultzerlawgroup.com*
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12061
Tel: (845) 483-7100
Facsimile: (888)749-7747

**LEEDS BROWN LAW, P.C.**
Jeffrey K. Brown *(pro hac vice forthcoming)*
*jbrown@leedsbrownlaw.com*
Blake Hunter Yagman*
*byagman@leedsbrownlaw.com*
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel: (516) 873-9550

*Attorneys for Plaintiff Grey Dog IV
d/b/a Ethos Wellness/Pharmacy and the Putative Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| GREY DOG IV d/b/a/ ETHOS WELLNESS/PHARMACY, on behalf of itself and all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>GOODRX, INC. and GOODRX HOLDINGS, INC.,<br><br>　　　　　　Defendants. | Case No.  2:24-cv-09858<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

# CLASS ACTION COMPLAINT

Plaintiff Grey Dog IV d/b/a Ethos Wellness/Pharmacy ("Plaintiff"), an independent pharmacy, on behalf of itself and all others similarly situated, allege the following class action complaint (the "Action") against the above-captioned Defendants GoodRx, Inc. and GoodRx Holdings, Inc. (collectively, "GoodRx" or the "GoodRx Defendants"), and CVS Caremark Corporation ("CVS"), Express Scripts Holding Company ("Express Scripts"), Medimpact Healthcare Systems, Inc. ("Medimpact") and Navitus Health Solutions, LLC ("Navitus") (collectively "Co-Conspirator PBMs"), upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of their counsel, for violations of Section 1 of the Sherman Antitrust Act as follows:

## I.    PRELIMINARY STATEMENT

1.    Pharmacy Benefit Managers or "PBMs" are third party companies that function as intermediaries between pharmaceutical manufacturers and third-party payors ("TPPs"), including health insurance providers. PBMs create formularies, negotiate rebates (the discount paid from a pharmaceutical manufacturer to a PBM), process claims, create pharmacy networks, review drug utilization and occasionally manage mail-order specialty pharmacies. Put simply, PBMs negotiate prices that TPPs pay to pharmacies for drugs as well as work with the pharmacies on reimbursement claims on those prices.

2.    This is an antitrust action under Section 1 of the Sherman Antitrust Act on behalf of independent pharmacies, which are the lifeblood of the United States' healthcare system, arising from an illegal agreement to suppress the prices paid by PBMs to independent pharmacies for generic prescription medication.

3.    Taken together, the Co-Conspirator PBMs represent nearly 95% of the PBM services market – meaning that they transact 95% of all reimbursement claims for generic prescription medications by pharmacies. The Co-Conspirator PBMs, since as late as January 1, 2024, engaged in an unlawful price-fixing arrangement in the

United States market for generic prescription medication reimbursement to independent pharmacies, like Plaintiff and Class members.

4.   In a July 2023 press release, GoodRx Interim CEO Scott Wagner announced the unlawful price-fixing arrangement, stating: "Through this program, patients don't have to choose between using their pharmacy benefit or using GoodRx to save on their prescriptions – now they can do both."

5.   The way that this works is as follows. As part of GoodRx's Integrated Savings Program ("ISP"), each of the Co-Conspirator PBMs agreed to supply competitively sensitive information to GoodRx and, using that competitively sensitive information, GoodRx works as a common decisionmaker to set the rates for reimbursement by PBMs to independent pharmacies for generic prescription medication. As part of the ISP program, the Co-Conspirator PBMs, who are horizontal competitors and should be competing in the Relevant Market to provide the best prices possible, agree not to bid against each other for the prices that they will pay pharmacies for generic prescription medication. Additionally, as part of the ISP program, GoodRx agrees with the Co-Conspirator PBMs to use GoodRx's pricing algorithm to determine pharmacy reimbursement rates for generic prescription medication prescriptions filled for patients insured by TPPs. Then the pharmacy is forced to accept the Co-Conspirator PBMs' inferior and supracompetitive rate: the lowest reimbursement rate negotiated by any of the Co-Conspirator PBMs (the "ISP Rate"). This also neutralizes GoodRx's natural price competition between itself, a discount services program, and the Co-Conspirator PBMs.

6.   But for this ISP scheme, the Co-Conspirator PBMs would need to necessarily compete with each other (and with GoodRx) for independent pharmacies, like Plaintiff and Class members, to join their networks – this includes offering higher rebates and rates of reimbursement for generic prescription medication than their horizontal competitors. As a result of this conduct, independent pharmacies suffer economically in the form of lower rebates and rates of reimbursement for generic

2
CLASS ACTION COMPLAINT

prescription medication from TPPs. Because of the dominant independent and collective market shares of the Co-Conspirator PBMs and the role of GoodRx in the ISP program, independent pharmacies are given little to no alternative but to accept the subpar rebates and rates of reimbursement for generic prescription medication offered to them. The scheme's participants benefit as follows: (1) GoodRx benefits through a cut of each transaction made through the ISP program (approximately $5 per transaction, leading to what GoodRx calls a "$200 million growth opportunity") and (2) the Co-Conspirator PBMs neutralize horizontal competition in the Relevant Market between each other.

7.   Against this backdrop, Plaintiff Grey Dog IV d/b/a Ethos Wellness/Pharmacy, an independent pharmacy, brings this Action against Defendant GoodRx on behalf of themselves and all other similarly situated independent pharmacies under Section 1 the Sherman Antitrust Act, seeking actual damages, restitution, treble damages, declaratory relief, injunctive relief, pre- and post-judgment interest, as well as reasonable costs and attorney's fees associated with the prosecution of this Action.

## II.    JURISDICTION AND VENUE

8.   Plaintiff brings this Action to remedy violations of Section 1 of the Sherman Antitrust Act. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

9.   This Court has personal jurisdiction over both of the GoodRx Defendants because the GoodRx Defendants reside in this District, Defendants transact business in this District, and Defendants caused injury in this District through their anticompetitive conduct.

10.   Venue is proper in this District because the GoodRx Defendants reside in this District, the GoodRx Defendants are licensed to do business in this District, and

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

a substantial portion of the affected interstate commerce in the relevant markets described herein was carried out in this District.

### III.  PARTIES

***Plaintiff Grey Dog IV d/b/a Ethos Wellness/Pharmacy***

11.    Plaintiff Grey Dog IV d/b/a Ethos Wellness/Pharmacy is a business entity with its principal place of business located in Key Biscayne, Miami-Dade County, Florida.

12.    As a result of the allegations contained herein, namely, the perpetration of the ISP scheme, GoodRx and the Co-Conspirator PBMs have caused Plaintiff economic harm since as late as January 1, 2024, through the ISP program. This economic harm occurred as a result of an unlawful price-fixing scheme that deprived Plaintiff of competitive rebate and generic prescription drug reimbursement rates. This is the type of harm that the federal antitrust laws are intended to protect against.

***Defendant GoodRx, Inc.***

13.    Defendant GoodRx, Inc. is a Delaware corporation with its principal place of business located in Santa Monica, California.

14.    GoodRx processes 2.5% of all prescription drug claims in the United States.

***Defendant GoodRx Holdings, Inc.***

15.    Defendant GoodRx Holdings, Inc. is a Delaware corporation with its principal place of business located in Santa Monica, California. GoodRx Holdings is a parent or affiliated entity of GoodRx, Inc., which is a subsidiary of GoodRx Intermediate Holdings, LLC, which is a wholly owned subsidiary of GoodRx Holdings, Inc.

16.    The GoodRx Defendants are collectively referred to herein as "GoodRx."

17.    GoodRx is a horizontal competitor of and competes with the Co-Conspirator PBMs.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

CLASS ACTION COMPLAINT

18.    Initially, when GoodRx entered onto the scene in 2011, GoodRx competed for patients with PBMs by way of its discount card programs that offered lower prices than most PBMs could offer. Indeed, the Co-Conspirator PBMs, including Express Scripts, CVS, and Navitus, identify the role of GoodRx as being competitive to the business models of PBMs.

**Co-Conspirator PBM CVS Caremark Corporation**

19.    CVS is the largest PBM in the United States and is a Delaware corporation with its principal place of business located in Woonsocket, Rhode Island.

20.    CVS entered into the scheme as late as 2024.

**Co-Conspirator PBM Express Scripts, Inc.**

21.    Express Scripts is a PBM and a Delaware corporation with its principal place of business located in St. Louis, Missouri.

22.    Express Scripts entered into the scheme as late as 2024.

**Co-Conspirator PBM Medimpact Healthcare Systems, Inc.**

23.    Medimpact is a PBM and a California corporation with its principal place of business located in San Diego, California.

24.    Medimpact entered into the scheme as late as 2024.

**Co-Conspirator PBM Navitus Health Solutions, LLC**

25.    Navitus is a Wisconsin limited liability corporation with its principal place of business located in Madison, Wisconsin.

26.    Navitus entered into the scheme as late as 2024.

27.    Together, the Co-Conspirator PBMs represent, individually, market dominance and/or, collectively represent a monopoly market share in the processing of all of the generic prescription medications in the United States as well as access to patients with insurance seeking to purchase generic prescription medication.

## IV.    FACTUAL ALLEGATIONS

### A.    The Relevant Market and Market Power

28.    *Geographic Market.* Subject to United States laws and regulations, the

CLASS ACTION COMPLAINT

relevant geographic market for this Action is the entirety of the United States. Furthermore, GoodRx and the Co-Conspirator PBMs function throughout the United States geographic market.

29.    *Product Market.* The relevant product market in this Action is the market for pharmacy reimbursements for prescription drug dispensing services in the United States. As described by the ISP scheme, the anticompetitive effects impact the whole product market and thus provide sufficient evidence that the Co-Conspirator PBMs and GoodRx possess sufficient market power in the Relevant Market.

30.    *Hypothetical Monopolist Test.* The proposed Relevant Market satisfies the test for market definition known as the hypothetical monopolist test. This test, called the SSNIP test, asks whether a hypothetical monopolist in a proffered market could impose small but significant (typically 5%) non-transitory price increases without causing a significant number of customers to switch to other products or services such that the SSNIP would not be profitable to the hypothetical monopolist.

31.    Here, the Co-Conspirator PBM collectively process as much as 2/3rds of all prescription claims processed in the United States, with access to more than 87% of patients with insurance. Thus, independent pharmacies like Plaintiff and Class members have no meaningful choice but to negotiate with the Co-Conspirator PBMs. The same logic holds true for independent pharmacies' ability to negotiate with GoodRx. GoodRx is working with a collectively dominant share of all PBMs and processes such a large number of prescription transactions that it cannot be avoided by independent pharmacies vis-à-vis programs like the ISP program.

32.    This means that, in turn, independent pharmacies would not be able to continue to function without going through GoodRx, the Co-Conspirator PBMs and the ISP program, as a whole. Thus, if the parties wanted to reduce the rebates and generic prescription drug reimbursement rates it offered to independent pharmacies as part of the ISP program by 5%, the independent pharmacies, like Plaintiff and Class

members, would have no choice but to surrender to the vice grip of GoodRx and its co-conspirators.

33.    *Market Power.* The Co-Conspirator PBMs and GoodRx, individually and collectively, possess market power that is more than sufficient to cause harm to competition and to consumers in the Relevant Market.

**B.    The ISP Cartel**

34.    Facing scrutiny and pressure from investors, GoodRx began to lose money between fiscal year 2022 and 2023. Rather than continue to compete with PBMs, as discount card programs like GoodRx generally do, GoodRx instead opted to enter into an unlawful scheme to suppress rebates and generic prescription medication reimbursement rates to independent pharmacies.

35.    This scheme publicly began on an earnings call on November 8, 2022, when GoodRx announced the ISP program. The program would begin "early 2023" and the first Co-Conspirator PBM to join the ISP program would be Express Scripts. The ISP program, using competitively sensitive, proprietary data provided by Express Scripts regarding the pricing of generic prescription medication pricing, would integrate GoodRx's discount program into Express Scripts' pharmacy benefits program.

36.    Each of the Co-Conspirator PBMs entered the ISP scheme with GoodRx on the following dates:

a) **February 2023:** Co-Conspirator PBM Express Scripts and GoodRx enter into the ISP program scheme. Express Scripts' specific program name would called "Price Assure."

b) **July 12, 2023:** Co-Conspirator PBM CVS agrees to enter the ISP program scheme. CVS' specific program name would be called "Caremark Cost Saver" program.

c) **September 13, 2023:** Co-Conspirator PBM Medimpact agrees to enter the ISP program scheme.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

d) **October 12, 2023:** Co-Conspirator PBM Navitus agrees to enter into the ISP program scheme. Navitus' specific program would be called "Savings Connect."

37. Indeed, GoodRx and the four Co-Conspirator PBMs had entered into a cartel which would govern the rates at which patients would receive discounts for generic prescription medications at pharmacies. This ISP scheme is a traditional cartel between horizontal competitors that would help drive volume sales for the participants; this, of course, was and is occurring at the behest of independent pharmacies, who, on the flipside of discounted prescription medications, would stand to lose while Defendants and the Co-Conspirators made off with handsome profits.

38. The way the ISP scheme's cartel conduct works is as follows:

a) GoodRx and the Co-Conspirator PBMs would agree and have agreed to share competitively sensitive and proprietary pricing data for generic prescription medications sold at retail. The ISP scheme could not exist but for the sharing of this information because otherwise the PBMs would not know which of them (and GoodRx) would have the lowest reimbursement rate to provide back to the pharmacy;

b) GoodRx and the Co-Conspirator PBMs would agree and have agreed to integrate operations, using GoodRx's algorithm, which would dictate rebates and reimbursement rates by TPPs to pharmacies for generic prescription medications, as a common decisionmaker; and

c) GoodRx and the Co-Conspirator PBMs would agree and have agreed to eliminate consumer choice by collaborating rather than competing with each other.

39. As a result of the cartel's conduct, they opted to collude rather than compete – and the harm caused here is felt by consumers, competitors and independent pharmacies alike.

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

C.    **The Unlawful Exchange of Competitively Sensitive Information and Use of GoodRx's Algorithm as a Common Decisionmaker**

40.    In the United States, under the Federal Trade Commission ("FTC") and Department of Justice's ("DOJ Antitrust Guidelines for Collaborations Among Competitors, it is unlawful for competitors to exchange competitively sensitive information.

41.    As the guidelines state:

[t]he sharing of information relating to price, cost, output, customers or strategic planning is more likely to raise competitive concern than the sharing of less competitively sensitive information.  Similarly, the sharing of information about current or future operating and/or business plans is more likely to be of concern than the sharing of historical information.  And the sharing of company-specific data is more likely to raise concerns than the sharing of aggregated data…

42.    While there is a "safe zone" for information exchanges, it does not apply here. The safe zone applies when the information is (1) managed by a trade association or other third party (therefore separated from the two entities), (2) is more than three months old and (3) no provider's data contributes more than 25% of the weight of the statistics shared.

43.    Here, there is no safe zone application for the GoodRx Defendants and the Co-Conspirator PBMs. This is because prongs 2 and 3 likely do not apply: the data shared with the GoodRx algorithm is real-time pricing information communicated for imminent transactions and CVS dominates the market for PBMs, therefore, the data in the dataset largely includes more CVS data than any other Co-Conspirator PBM.

44.    Recently, the United States has pursued litigation whereby information exchanges are alleged to have been facilitating a price-fixing scheme:

The United States … files this statement to make clear that (1) information sharing alone can violate Section 1, even without an agreement to fix prices; and (2) information exchanges that report only aggregated data can [also]

violate the antitrust laws, even where the information is not linked to specific competitors. Ultimately, the antitrust laws prohibit information sharing among competitors whenever such exchanges tend to harm competition.[1]

45. The use of an algorithm to set prices is even more problematic. According to the DOJ, in November of 2023: "Algorithmic price fixing must be subject to the same condemnation as other price fixing schemes. It makes no difference that prices are fixed through the joint use of an algorithm instead of by a person."[2]

46. Indeed, the DOJ continues, "[…] given the amount of information an algorithm can access and digest, this new frontier poses an even greater anticompetitive threat than the last."

47. Free of concessions—concessions which would not be made by the GoodRx Defendants and the Co-Conspirator PBMs voluntarily but for antitrust enforcement—the parties will continue to cause antitrust injury.

**D.   Antitrust Injury**

48. Beginning as late as January 1, 2024, the ISP scheme and its cartel members have caused a throttling of competition in the Relevant Market and have used the throttling to reduce rebates and generic prescription medication reimbursement rates paid to independent pharmacies by TPPs.

49. *Harm to Competition.* Due to the ISP scheme, the cartel members do not compete with each other on the prices in the Relevant Market (specifically, the rebates and reimbursement for generic prescription medication paid to pharmacies) negotiated by each PBM. This means that non-members of the cartel, who are competing because they do not belong to the ISP scheme, are losing out on critical competition on the merits within the Relevant Market.

---

[1] United States' Statement of Interest, Oct. 1, 2024, *In re Pork Antitrust Litigation*, 0:18-cv-1776-JRT-JFD (D. Mn. 2018) at ECF No. 2616,
[2] United States' Statement of Interest, Nov. 15, 2023, *In re RealPage, Rental Software Antitrust Litigation (No. II)*, 3:23-md-3071 (M.D. Tn. 2023) at ECF No. 627.

50.   *Harm to Plaintiff and Class.* Due to the ISP scheme, reimbursement amounts paid to independent pharmacies (specifically, rebates and reimbursement amounts for generic prescription medications) have been artificially and unlawfully suppressed below competitive levels.

## V.   CLASS ALLEGATIONS

51.   Plaintiff brings this action on behalf of itself, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representative of the Class (hereinafter defined collectively as the "Class"), which is defined as follows:

> **Nationwide Class:**   All pharmacies in the United States that are not members of the same corporate family as a Co-Conspirator PBM and that was reimbursed for generic prescription medication pursuant to the GoodRx ISP program during the relevant statutory period or until when the alleged anticompetitive conduct ceases.

52.   Excluded from the Class are the GoodRx Defendants, Co-Conspirator PBMs and their affiliates and/or subsidiaries, and Defendants' subsidiaries, affiliates, officers and directors, and any entity in which Defendants or Co-Conspirator PBM has a controlling interest; and all judicial officers assigned to hear any aspect of this litigation.

53.   Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

54.   **Numerosity**. Members of the Class are so numerous that joinder would be impracticable, as thousands of Class members exist.

55.   **Commonality.**  Questions of law and fact common to the Class include:

(a) Whether Defendants and Co-Conspirator PBMs in fact engaged in anticompetitive acts aimed at unreasonably restraining competition in the Relevant Market;

(b) Whether such conduct violates the Sherman Act;

(c) Whether such conduct injured the Class members; and

CLASS ACTION COMPLAINT

(d) Whether injunctive relief should be provided to Class members as a result of Defendants' wrongful conduct.

56. **Typicality.** Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiff, like all other Class members, was injured by Defendants' uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, such that there are no defenses unique to Plaintiff. The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

57. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the Class members in that Plaintiff has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in antitrust class action litigation, and Plaintiff intends to prosecute this action vigorously.

58. **Superiority of Class Action.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

59. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant

CLASS ACTION COMPLAINT

manageability problems with prosecuting this lawsuit as a class action.

60.    Adequate notice can be given to Class members directly using information maintained in the parties' records.

61.    **Predominance.** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

62.    This proposed class action does not present any unique management difficulties. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE SHERMAN ACT
### 15 U.S.C. § 1
### UNREASONABLE RESTRAINT OF TRADE
### (Against GoodRx Inc. and GoodRx Holdings Inc.)

63.    Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

64.    Beginning in 2024, if not earlier, Defendants and the Co-Conspirator PBMs colluded to artificially suppress the rebates and reimbursement rates for generic prescription medications sold in the United States under the GoodRx ISP program.

65.    The ISP cartel has caused Plaintiff and members of the Class to suffer

CLASS ACTION COMPLAINT

economic damages.

66.     There are no procompetitive justifications for the ISP cartel's agreements, and any proffered pro-competitive justifications, to the extent legitimate, could have been achieved through less restrictive and more competitive means.

67.     The ISP cartel is unlawful under a *per se* mode of analysis.

68.     In the alternative, Defendants' cartel is unlawful under a quick look or rule of reason mode of analysis.

69.     Additionally, Defendants' cartel violates Section 1 of the Sherman Act because of the unlawful information exchanges that took place (and continue to take place) between Defendants and Co-Conspirator PBMs.

70.     Defendants' and the Co-Conspirator PBMs' conduct caused Plaintiff and the members of the Class to suffer economic harm redressable through the relief requested, including actual damages, treble damages, pre- and post-judgment interest, injunctive and declaratory relief and reasonable costs and attorneys' fees.

## VII.  PRAYER FOR RELIEF

71.     To remedy these illegal acts, Plaintiff requests that the Court:

a) Certify the Class and appoint Plaintiff as the Class' representative;

b) Declare, find, adjudge, and decree that the ISP cartel is unlawful and violates the Sherman Act;

c) Permanently enjoin Defendants from finalizing and/or continuing to profit from the ISP program, or, if necessary, ordering divestiture of any consideration that may have been made between GoodRx and any of the Co-Conspirator PBMs;

d) Declare the ISP program between the Defendants to be null and void and against the public policy of the United States which declares that competition rather than combination is the rule of law and of trade in the United States;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

e) Award to Plaintiff their costs of suit, including reasonable attorneys' fees, as provided by the Sherman Act;

f) Award to Plaintiff their damages, in the amount to be determined by a jury, inclusive of treble damages as provided by the Sherman Act;

g) Grant to Plaintiff and Class any such and other relief to which they may be entitled and which this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury so triable on all claims so triable under Federal Rule of Civil Procedure 38(b).

DATED: November 14, 2024,          **CLARKSON LAW FIRM, P.C.**

*/s/ Mark I. Richards*
Ryan Clarkson, Esq.
Yana Hart, Esq.
Mark I. Richards, Esq.
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Email:rclarkson@clarksonlawfirm.com
Email:yhart@clarksonlawfirm.com
Email:mrichards@clarksonlawfirm.com

**SULTZER & LIPARI, PLLC**
Jason R. Sultzer (*Pro Hac Vice Forthcoming*)
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12061
Tel: (845) 483-7100
Email: sultzerj@thesultzerlawgroup.com

**LEEDS BROWN LAW, P.C.**
Jeffrey K. Brown (*Pro Hac Vice Forthcoming*)
Blake Hunter Yagman (*Pro Hac Vice Forthcoming*)
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel: (516) 873-9550
Email: jbrown@leedsbrownlaw.com
Email: byagman@leedsbrownlaw.com

15
CLASS ACTION COMPLAINT

**THE FERRARO LAW FIRM, P.A.**
James L. Ferraro (*Pro Hac Vice Forthcoming*)
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Tel: (305) 375-0111
Email: jferraro@ferrarolaw.com

*Attorneys for Plaintiff and the Proposed Class*

16

CLASS ACTION COMPLAINT